FILED

1

1
2      UNITED STATES DISTRICT COURT PM 3:02
       MIDDLE DISTRICT OF FLORIDA
3            ORLANDO DIVISION
       CASE NO: 6:02-cr-147-Orl-22KRS
4                 6:03-cr-150-Orl-22KRS

5  UNITED STATES OF AMERICA,

6          PLAINTIFF,

7  VS.

8  THAD RYAN ROBERTS,

9          DEFENDANT.

ORIGINAL

10

11              SENTENCING PROCEEDINGS

12      BEFORE THE HONORABLE ANNE C. CONWAY
            UNITED STATES DISTRICT JUDGE
13

14                OCTOBER 29, 2003
                  ORLANDO, FLORIDA
15

16

17  APPEARANCES:

18
    RACHELLE DES VAUX BEDKE, AUSA
19  FOR THE PLAINTIFF

20  JOHN E. FERNANDEZ, ESQUIRE
    FOR THE DEFENDANT
21

22
    OFFICIAL COURT REPORTER: RITA G. MEYER, RMR-CRR
23

24

25  ***PROCEEDINGS RECORDED STENOGRAPHICALLY ***
    COMPUTER-AIDED TRANSCRIPTION

154

SCANNED

1          (Proceedings commenced at 9:40 a.m.)

2          THE COURT:  Case Number 2002-147 and 2003-150,

3  United States versus Thad Ryan Roberts.

4          Could we have appearances, please?

5          MS. BEDKE:  Good morning, Your Honor.  Rachelle Des

6  Vaux Bedke for the United States.  And I apologize for my

7  tardiness.  We got into a traffic jam because of an accident

8  on the way over.

9          THE COURT:  Well, there are always accidents on I-4,

10 so you should keep that in mind.

11         MS. BEDKE:  My apologies, Your Honor.

12         MR. FERNANDEZ:  John Fernandez on behalf of

13 Mr. Roberts, who's present and seated to my right.

14         THE COURT:  Good morning.  Good morning,

15 Mr. Roberts.

16         THE DEFENDANT:  Good morning.

17         THE COURT:  On December 18, 2002, you entered a plea

18 of guilty of guilty to Count One of the indictment at Docket

19 Number 22, charging you with conspiracy to steal and sell

20 Government property valued in excess of $1,000; and

21 transportation of stolen goods valued at $5,000 or more, in

22 violation of Title 18 United States Code Section 371; and

23 Count Two of the indictment, charging you with transportation

24 of stolen goods valued at 5,000 or more, in violation of Title

25 18 United States Code Section 2314.

1          And on August 13th, 2003, you pled guilty to Count
2     One of the information at Docket Number 12, charging you with
3     possession of stolen United States property, in violation of
4     Title 18 United States Code Section 641.
5          We've now reached the stage in the proceeding where
6     it's my duty to to address several questions to you and your
7     attorney as well as counsel for the Government.
8          Have you had the opportunity to read and discuss the
9     pre-sentence report with your attorney?
10          THE DEFENDANT:  Yes, I have.
11          THE COURT:  Do you wish to make any objections?
12          THE DEFENDANT:  No.
13          THE COURT:  Counsel?
14          MR. FERNANDEZ:  Your Honor, we did articulate one
15     objection to the pre-sentence report.
16          THE COURT:  Do you wish to be heard on that?
17          MR. FERNANDEZ:  Yes, Your Honor, if I could.
18          THE COURT:  Go ahead.
19          MR. FERNANDEZ:  This is briefly regarding material
20     that is not strictly relevant to any sentencing guideline
21     issue, but it is material that we think can have a harmful
22     impact on Mr. Roberts.  It involves some allegations by his
23     father.  We submit that under the rules, this kind of material
24     or any material to be included in the pre-sentence report has
25     to have some degree of relevance either to the sentencing or

1   to the Bureau of Prisons and their treatment of the

2   individual.  And we don't think that material would be

3   relevant in either circumstance; so therefore, we're asking

4   the Court to strike it from the pre-sentence report and order

5   the probation office to prepare an amended pre-sentence report

6   that doesn't include the language.

7            THE COURT:  What is the Government's position?

8            MS. BEDKE:  Your Honor, the Government really

9   doesn't have anything to add over and above what probation has

10   included in the addendum.

11            THE COURT:  All right.  I'm going to overrule your

12   objection.  I agree with the probation office that it would be

13   helpful to the Bureau of Prisons in their handling of

14   Mr. Roberts --

15            MR. FERNANDEZ:  Your Honor --

16            THE COURT:  -- so I'm going to deny the motion to

17   strike.

18            MR. FERNANDEZ:  We also would object to it on the

19   grounds it is factually inaccurate.

20            THE COURT:  Well, do you have some information that

21   you wish to present or a counter to it that you would like

22   added?

23            MR. FERNANDEZ:  Well, I would submit that, that the

24   probation office is the one that has to come forward with the

25   evidence to substantiate -- what we have, what we have here

1   is, in essence, a statement.  There is, granted, there's a
2   dispute between Mr. Roberts and his father and his family, and
3   we submit it has, it's caused, is related to a religious
4   dispute.
5          THE COURT:  Ms. Davis, where did you get the
6   information?
7          THE PROBATION OFFICER:  Judge, I actually spoke with
8   the Defendant's father and he's the one who related the
9   information to me.  I could have the father corroborate the
10  information with the actual individuals involved, but we
11  declined to do that.  But if the Court needs that information,
12  we can obtain it.
13         THE COURT:  All right.  Well, I think it is clear in
14  here, if it's not, we'll make it, that this is what the father
15  told the probation office and we can add a sentence that the
16  Defendant denies it or whatever sentence the Defendant wants
17  to add to that.
18         MS. BEDKE:  I would note, Your Honor, on page 11 of
19  the report, paragraph 62, the very last sentence says that the
20  Defendant denies the allegations and it attributes the
21  allegations to the father.
22         THE COURT:  Right.  That entire paragraph is
23  attributed to the father's statement.  So I think that takes
24  care of the objection as far as the Bureau of Prisons having
25  the ability to deal with the information.

1        Do you have any other objections?

2        MR. FERNANDEZ:  No, Your Honor.

3        THE COURT:  Any objections by the Government?

4        MS. BEDKE:  No, Your Honor.

5        THE COURT:  The Court adopts the factual statements

6 contained in the pre-sentence report as to which there is no

7 objection.  The Court adopts the position of the probation

8 office as stated in the addendum.

9        The Court determines the guidelines are Total

10 Offense Level 23, Criminal History I, 46 to 57 months, two to

11 three years supervised release; $9,167.12 restitution, $10,000

12 to -- what is the upper range of the fine?

13        THE PROBATION OFFICER:  Just one second, Judge.  It

14 should be $100,000.

15        THE COURT:  Okay.  $300 special assessment.

16        The Court mentioned at the last hearing that I

17 believed that an upward departure would be appropriate in this

18 case under 5(k)2.7.  I believe that I've given notice that is

19 required by that.  It is the Court's intention to depart eight

20 levels to the top of the loss range, based upon the fact that

21 this is not an ordinary situation; the significant disruption

22 of a government function by Mr. Roberts stealing these moon

23 rocks.

24        Personally, Doctor Gibson's testimony and the trial

25 in this case was heart wrenching.  All the work that he had

1  done that was just for naught because Mr. Roberts decided to
2  steal not only the lunar samples, but all of his scientific
3  work that had been written in notebooks, and these were
4  national treasures that are priceless.  And the Court feels
5  that it's appropriate to grant or to impose an upward
6  departure of eight levels to get to the top of the loss range
7  because that still does not come anywhere near giving the
8  public the kind of punishment that should be given for the,
9  for such a loss.
10         Would you like to be heard on that?
11         MR. FERNANDEZ:  Yes, Your Honor.  First, we would
12  obviously -- well, we would object to that.  The first grounds
13  would be that the Court, by our position, would have to find
14  that there was a substantial disruption pursuant to 5(k)2.0.
15  In the application notes thereabouts, they talk about the
16  application of this kind of a departure and they mention that
17  in some circumstances, it would be appropriate only to impose
18  a departure if there was a substantial disruption.  We've got
19  an offense like bribery or perjury, an offense that has
20  inherent components of a disruption of government function,
21  there would be a higher standard of showing there was a
22  disruption to the Government.
23         In this case, Mr. Roberts is accused of theft of
24  government property.  We would submit in this case, the
25  charges that he's facing, there is inherent in these charges

1  some disruption of government property or government function;
2  so therefore, we would submit there would be a higher standard
3  here that would be required to show disruption.

4         THE COURT:  Well, the theft of the, the box that the
5  lunar samples were in disrupted the Government, the file
6  cabinet disrupted the Government.  I can't think of anything
7  more of a significant disruption to NASA, and certainly to
8  Doctor Gibson, who, and I'm incorporating his testimony in the
9  McWhorter case in my findings, both he and -- Doctor Gibson
10  and the other experts who testified, Doctor Lofgren and Doctor
11  Smith, all testified concerning the facts of this case, that
12  take it out of the ordinary theft of government property.

13         I mean, you could go steal a truck from the
14  Government and disrupt the property because whatever they were
15  doing, they couldn't do anymore because the truck was gone.
16  But I mean, to get the same thing back, the Government would
17  have to go back 20 or 30 years in the space program.  We're
18  not going up to the moon to get rocks and samples every day.
19  And in fact, you know, Mr. Smith can never go back and get
20  those things.  Doctor Gibson can never go back and get his
21  notes and they can't use the rocks for the same educational
22  and scientific uses they had before because they're now
23  worthless.  And the testimony by Doctor Gibson was that he
24  still doesn't know where his notebooks are.  And that's a very
25  significant disruption to his work.

1          MR. FERNANDEZ:  If I may, Your Honor, with regard to
2     the facts of the case, my understanding is that the material
3     was taken from Doctor Gibson's office at a time when he was on
4     vacation in Australia.  Within a week, the materials were back
5     in the possession of the United States Government, so the
6     materials were out of the Government's possession --
7          THE COURT:  The testimony in the trial was that they
8     are no longer worth anything for a scientific basis because
9     they've been disrupted and there's no chain of custody
10    anymore.  And you know, Doctor, I mean Doctor Gibson was
11    practically in tears on the stand because his, everything he
12    had worked for was all for nothing.  From now on, I mean
13    there's nothing further he can do and he doesn't, he can't
14    even write a book.  I guess Mr. Roberts is the only one that's
15    going to be able to write a book on this because he doesn't
16    have his notebooks anymore.
17         MR. FERNANDEZ:  Your Honor, I don't believe there
18    was, I haven't seen any testimony at any time by Doctor Gibson
19    indicating that he was presently engaged in any research
20    involving the lunar samples that were taken.
21         THE COURT:  My memory of the testimony is that he
22    can't.
23         MR. FERNANDEZ:  I believe that the testimony also
24    was that he had been in possession of those lunar samples for
25    somewhere close to 30 years; that he had written something

1  like 100 published papers; that he had not had any funded

2  research proposals involving those lunar samples in the last

3  12 years.  Given that he had, he didn't testify that he was

4  currently engaged in any active research with that material,

5  just talking about the lunar samples, putting aside the issue

6  of his notebooks but the lunar samples, I don't think there's

7  any evidence to indicate that there was any disruption in any

8  ongoing research activity.

9           I'd also submit that all of the lunar samples that

10  were in this case are minute subsamples of a larger collection

11  of pristine materials, which had been held in the lunar vault

12  at NASA in Houston, which have, in fact, not been exposed to

13  the environment in the way that Doctor Gibson, himself, had

14  exposed all of the samples that he had in his possession.  So

15  any research that one, that was proposed to go forward, was

16  not hindered by the fact that these materials had been taken

17  for a week by Mr. Roberts.

18           I don't think there's sufficient evidence to

19  indicate that the samples, themselves, the deprivation of the

20  samples, themselves, interrupted or disrupted any ongoing

21  future or future research on those.

22           THE COURT:  All right.

23           MR. FERNANDEZ:  I also submit, if I may, just to

24  make the Record, that Doctor Gibson's notes, while they're a

25  significant loss, we understand that is a significant loss for

1 one to lose their notes, there was no testimony indicating
2 that he had any projects that were pending, are pending or
3 planned with regard to those notes.  I don't know if there was
4 testimony that said that he was planning to write a book which
5 he can use those notes to write a book, but the testimony that
6 I've reviewed from the trial, there was no testimony
7 indicating what uses he had planned for those books.
8         Again, he had published, by his testimony, something
9 in excess of 100 research papers over his 30-year career.  And
10 I would submit that the inference isn't there to draw from,
11 from that evidence, that any research or any, any further
12 activities that he wanted to engage in, he could use the
13 documents that he's already created the published research
14 that he's already done.  So I would submit with regard to
15 Doctor Gibson, that it is not sufficient to show that this
16 substantially disrupted any ongoing further activities of his.
17         I think there may also be an issue here with regards
18 to difference between a governmental function and a scientific
19 function.  I'm not sure what Doctor Gibson is, whether he's
20 conducting research that is outside of the scope of his
21 employment as a government agent.  You know, these individuals
22 at this level of their profession, you know, he's engaged in
23 all kinds of different activities all around the world.  Some
24 of those may be funded by foreign corporations or foreign
25 companies or by international corporations and not funded by

1    the U.S. Government.  So his activities are not all
2    attributable to furthering any activities that are paid for by
3    the United States Government.

4           So with regard to Doctor Gibson, we would
5    respectfully submit that the disruption of, the loss of these
6    materials for that one-week period of time, is not so
7    substantial or egregious, although we respectively admit that
8    there is a, there is a symbolic significance to the, to the
9    loss of those moon rocks and we're not downplaying that
10   effect.  But we're just saying that when we're looking at
11   5(k)2.7, we're talking about disrupting government functions;
12   that there, in fact, was very little of any disruption of
13   government function here.

14          THE COURT:  All right.  Well, there is also the
15   unusual circumstances that would justify it.  The Court would
16   cite to U.S. versus Garcia, 900 F.2d. 45, Fifth Circuit 1990
17   and United States versus Roth, 934 F.2d. 248, Tenth Circuit
18   case, 1991.

19          MR. FERNANDEZ:  Your Honor, we would respectfully
20   respond, we would submit this case is in actuality, it is
21   nothing much more than, outside of the fact that the rocks,
22   themselves, have some symbolic value, it's nothing more than a
23   simple burglary is what this case amounted to.  Had this
24   material been a stack of dollars or some computers, then, and
25   he had taken these things for a week during which time nobody

1  was going to use them and they are returned, I don't think we
2  would see the kind of 5(k)2.7 departure that you're imposing
3  in this matter.  So it's simply the fact that in my view, that
4  these rocks, that this material had been collected by NASA.

5  THE COURT:  Well, that's exactly the point.  That's
6  what makes it an unusual circumstance under 5(k).

7  MR. FERNANDEZ:  I would object that it's not
8  creating a governmental -- it's not disrupting the Government.
9  That's not the point of the 5(k)2.7 departure.

10  THE COURT:  Well, okay.  Ms. Bedke, do you wish to
11  be heard on this?

12  MS. BEDKE:  Your Honor, based upon the Court's
13  announcement at the last hearing that you intended to grant an
14  upward departure, the Government did do some research on this
15  issue, and I would particularly cite to the following four
16  cases:

17  United States versus Magluta, M-A-G-L-U-T-A, at 203
18  F.3d. 1304, an Eleventh Circuit case decided in 2000; united
19  States versus Ginby, G-I-N-B-Y, at 112 F.3d. 1493, an Eleventh
20  Circuit case decided in 1997; United States versus Regueiro,
21  R-E-G-U-E-I-R-O, 240 F.3d. 1321, an Eleventh Circuit case
22  decided in 2001; and finally, United States versus Kramer at
23  943 F.3d. 1543, an Eleventh Circuit case decided in 1991.

24  In each of these cases, Your Honor, the Eleventh
25  Circuit addresses the issue of a 5(k)2.7 upward departure for

1  disruption of government function, and I believe they're
2  relevant to the Court's determination in this case.  And I
3  would say, based upon my reading of the cases, they would
4  support the Court's decision.

5          In particular, the Ginby case, Your Honor, at page
6  1500, notes that the text of 5(k)2.0 suggests that 5(k)2.7 can
7  apply to theft that involves significant disruption of a
8  governmental function, so it certainly seems a case involving
9  theft does not, in and of itself, contemplate or take into
10 consideration, disruption of the governmental function so that
11 an upward departure, separate and apart, would be appropriate
12 under the right factual circumstances.

13         Your Honor, the only other thing I'd like to point
14 to other than what the Court has already noted for the Record,
15 is that in the PSI, on page eight, paragraph forty, the
16 probation office notes that NASA submitted additional claims
17 for restitution but that the items listed are not covered in
18 the statutory provisions for restitution; and therefore,
19 weren't included in the report.  Your Honor, my information,
20 and I would defer to probation on this score, is that these
21 claims have to do with lost research time not only by Doctor
22 Gibson, but by some private contract researchers that had been
23 employed by NASA to work on the particular samples that were
24 stolen and attempts to put a dollar figure on that lost
25 research time and the salary that those people would've

1   received because the samples for the period that the samples
2   were not only stolen, but for the period of time that they've
3   been in the custody of the Federa Bureau of Investigation
4   because of the pendency of this case.  They are still in FBI
5   custody.  They have not yet been returned to NASA for the
6   reason of this case.

7           There are also some notes in here about Doctor
8   Lofgren's time, about Kelley Cyr's time.  He's the gentleman
9   who spoke to the accounting issues about how much money it
10  costs to send the lunar capsules to the moon to get the rocks;
11  the mission.  If we were to adjust those numbers for the
12  missions, how much it would cost to repeat those missions in
13  current day dollars, his time spent working on this case, the
14  travel expenses incurred by NASA to fly those people back and
15  forth to Florida to assist law enforcement with that case, not
16  during the investigative phase but during the trial -- of
17  course, we had more than one trial not because of Mr. Roberts,
18  of course, but because of Mr. McWhorter, or more than one
19  trial date and things of that nature.  And, Your Honor, I just
20  wanted to point that out simply because there is reference
21  made to it in the PSI, and that seems to suggest another
22  disruption, if you will, other than what the Court's already
23  articulated.

24          THE COURT:  All right.  To make sure that the Record
25  is clear, the reason that I'm adding eight levels is because

1    of the fact that the Court believes that these are priceless
2    national treasures and that's the top of the range.  So --
3    since the Court has to give a reason for the number of levels
4    it is departing.

5           Ms. Bedke, would you like to be heard on your
6    motion?

7           MS. BEDKE:  Yes, Your Honor.  The Government filed a
8    motion on Mr. Roberts' behalf under 5(K)1.1 for his
9    substantial assistance to the United States.  As the motion
10   indicates, Your Honor, the Government feels that he deserves a
11   two-level reduction because of his cooperation, primarily
12   against Gordon Sean McWhorter, and his testimony during the
13   trial of Mr. McWhorter, which we believe contributed greatly
14   to his conviction.

15          THE COURT:  All right.  Would you like to be heard?

16          MR. FERNANDEZ:  Yes, Your Honor.  We'd ask the Court
17   to impose, give him credit for eight levels as the Court did
18   with Tiffany Fowler for her substantial assistance in the
19   matter.  Mr. Roberts, from his initial apprehension, was
20   cooperative.  He debriefed; when he was initially arrested, he
21   cooperated entirely.  He admitted his entire involvement in
22   the case.  He implicated those that were involved in the
23   offense with him.  He consented to searches of his property.
24   He consented to his jointly occupied property searches.

25          When he was brought to Tampa following his initial

1   appearance in Tampa, he agreed to a proffer with the
2   Government.  The point being that the Government was seeking
3   information that they could use in their detention efforts
4   against Mr. McWhorter and Mr. Roberts, I submit, was entirely
5   cooperative and truthful with them, including pointing out to
6   them specific pieces of information, which lo and behold,
7   which became pointed out and used in the detention hearing
8   against Mr. McWhorter.

9           Subsequent to the indictment being filed against
10  him, he entered a plea agreement; he agreed to cooperate.  He
11  submitted to, I think, two or three debriefings by the
12  Government in preparation for his testimony at Mr. McWhorter's
13  trial.  We submit that he testified truthfully and openly at
14  that trial, and as the Government submits, he was of
15  substantial assistance in the conviction of Mr. McWhorter.

16          So we would submit that his cooperation in this case
17  has been every bit as forthcoming and timely and honest and
18  truthful as was Tiffany Fowler and Shae Saur in this matter
19  and the Court has previously indicated that the Court felt
20  that their cooperation was meritorious of an eight-level
21  departure.

22          THE COURT:  If I recall, their departure was based
23  on aberrant behavior and that they got some credit at the
24  Government's request, but my concern with Mr. Roberts is that
25  he was the instigator and he thought up this whole thing and

1  he got everybody else involved in it.  And then to turn around
2  and testify against them was just sort of -- Mr. Roberts, in
3  my opinion, is a master manipulator and if the system says,
4  well, you can get a reduction by doing this, he's going to do
5  it.

6           MR. FERNANDEZ:  Your Honor, if I may, just with
7  regard to that point.  Mr. Roberts, from the get go, advised,
8  when he was in contact with his co-defendants, to plead.  At
9  no time did he do anything other than admit to them that he
10 was going to cooperate and suggest to them that they
11 cooperate.  At an early stage, he, through me and in his own
12 personal contacts with the agents, advised them that Tiffany
13 Fowler and Shae Saur's participation in this matter was minor
14 and that he was extremely remorseful they had been involved in
15 this and he took whatever steps he could to exculpate them
16 within the, within, with his truthful testimony.  So at no
17 time, I would submit to the Court, did Mr. Roberts attempt to
18 manipulate these other individuals during the course of any
19 litigation that I was aware of.

20          THE COURT:  I was referring to prior, getting them
21 involved in the first place.

22          MS. BEDKE:  Your Honor --

23          THE COURT:  Ms. Bedke?

24          MS. BEDKE:  Your Honor, I would have no disagreement
25 with anything that Mr. Fernandez said in characterizing

1  Mr. Roberts' cooperation.  And in response to your comments,
2  Your Honor, I believe you are correct.  I don't remember the
3  exact breakdown, but my recollection is that Miss Fowler and
4  Miss Saur both received either three or four levels for their
5  cooperation, and then the balance of their reduction was based
6  on aberrant behavior.

7          THE COURT:  All right.  I'm going to grant
8  Mr. Roberts a one-level reduction.  The Court has the
9  discretion, based on all the factors, including the factors
10 listed in 18 USC section 3553(e).  My initial inclination was
11 not to give him any kind of departure, but based upon the fact
12 that he did testify and it wasn't his fault that Mr. McWhorter
13 went to trial, and Mr. Roberts was the one who needed to
14 testify against him, since he's the one who had all the
15 information, so I'll grant a one-level departure and sentence
16 him at level 30, which is 97 to 121 months.

17         Do you know of any reason why the Court should not
18 now proceed with the imposition of sentence?

19         MR. FERNANDEZ:  No, Your Honor.  But we would like
20 to be heard.

21         THE COURT:  Go ahead.

22         MR. FERNANDEZ:  Your Honor, I'm concerned that the
23 Court's impression of Mr. Roberts is somewhat misperceived in
24 his character and his life.  Thad Roberts is a person that has
25 worked hard his entire life.  I think the pre-sentence report

1  indicates, Your Honor, when he was 13 years old, he began to
2  work.  He was steadily employed.  And while he was, while he
3  was in high school working, he still finished the top of his
4  high school class.  And this is in a situation where, a very
5  strict family situation, that by all accounts was very tense.
6  There was problems in the family situation.

7          He then goes and enrolls in the University of Utah
8  where he begins a course of study with his high school
9  sweetheart, who he subsequently marries.  While he's in, while
10 he's in school, he's working part time, he's got to stop what
11 he's doing to go on a Mormon mission pursuant to his parents'
12 request.  He's honest with them regarding his relationship
13 with his fiancee', which leads them dismissing him from the
14 mission.  That's just a religious situation.  You can't have
15 had premarital sex and be a Mormon mission, so he comes back
16 to his home in disgrace.  His parents basically are going to
17 excommunicate him just for that.  He leaves the Mormon
18 religion; he's now basically on his own.

19          While on his own, he continues to pursue his
20 education.  He continues to study at the University of Utah;
21 he continues to work and support himself and do well.  His
22 list of accomplishments are, I would say, extremely
23 noteworthy.  While he's in the University of Utah, he engages
24 in a number of charitable pursuits.  He and his wife,
25 together, raised almost ten thousand dollars for the Cystic

1  Fibrosis foundation by going door to door, soliciting
2  donations for their sponsored bicycle ride from Salt Lake City
3  to San Francisco.  He works as a volunteer fire fighter where
4  he works in fire fighting.

5          He, while he's a member of the physics college at
6  the University of Utah, he observes a dome on the observatory
7  on top of a physics building which is not being used and
8  indicates that to one of his advisors who allows him to go up
9  there, himself.  He goes up to see it's not working; he and
10  his wife come back up the next week, they clean it and repair
11  it, a drive gear.  They get it working and then from there is
12  the point where the University of Utah creates a lab that's up
13  there, a society, astronomical society which he was the
14  president of from 1998 to present.  He develops a star party
15  where people come up there and they're observing the universe
16  through this telescope.  The University then goes so far as
17  they improve the rooftop.  They build an elevator so they can
18  get people up there to start using this facility that they're
19  using it in their classes.  He reaches the point where they
20  begin to pay him part time in order to facilitate the use of
21  this, of this equipment.

22          He's a member of the Student Advisory Council for
23  the physics department; Student Advisory Council for the
24  geology department.  He participates in a number of
25  paleontological activities with the University of Utah where

1  they go out to sites to do digs, so he participates with them
2  on these digs.  He learns that there's an interest in this, so
3  he begins -- he's a self-starter to create these activities --
4  where he creates an e-mail list with people that he knows or
5  friends and advertises and he begins to, to put together these
6  kinds of forays where they go out and they participate in
7  these kind of digs, including a larger number of people in the
8  world of paleontology.
9          He, as a self-starter, again he goes and he
10 discovers that NASA has the co-op program.  There's no
11 official link between NASA and the University of Utah, so he
12 had to investigate this, himself; develop the contacts in the,
13 the faculty there that would sponsor him or support him on
14 this and then apply to NASA and go to NASA and engage in these
15 kinds of co-op activities.
16         While he's in Houston for these summers, two summers
17 and the fall, I guess, that he spent out there, he volunteers
18 as a part-time teacher in a school.  And he uses his
19 connections as a, with NASA, he brings one student and his
20 father to NASA, to a flight simulator.  These are problem
21 children in the schools.  He brings them to NASA, and he
22 introduces them to -- the flight simulator operator allows the
23 child and the father to be in the flight simulator, and create
24 such a positive experience, the child goes back to the school
25 and then presents this experience to the different classes

1  that this child is, is attending.

2          He has a consistent record of working hard, of being
3  other oriented.  He also has -- and this is where a good
4  person makes a mistake.  He also sees resources that are under
5  utilized and seizes upon an opportunity to better utilize
6  those resources.  I think there was a couple of telling
7  examples.  One was the physics observatory which was sitting
8  dormant on top of this building, which he instigates the
9  development of, but he also told me about an experience he had
10 where he was on one of these digs, where they're out there,
11 and they find some fossils which the curators that were with
12 them deemed were not worthy of being included in the
13 collection.  But once they had been unearthed, decide to just
14 throw them back, throw them back on the ground, which to his
15 mind is an example of, of a waste.  Because that bone, that,
16 that sample is something that's just going to degrade once
17 it's been exposed to the environment.

18         His activities with the University of Utah Museum, I
19 think are the next step in that same similar kind of thinking
20 where he's, he's working as a part-time curator at the Museum,
21 down in the, the bowels of the Museum, and there are
22 collections down there, materials that are never going to see
23 the light of day because they're just sub, they're inferior
24 specimens.  But they're still maintained by the University.
25 He sees these as things that are victimless crimes, in the

1 | sense that they're not being used, they're just being stored
2 | down there.
3 | So he picks up a trinket, picks up an object; he
4 | takes it back to his house, which gives rise to the second
5 | indictment that's against him, but his thinking is not that
6 | he's hurting someone.  His thinking is this is not just being
7 | utilized and he can utilize it.  He can show it to kids, he
8 | can show it to other people.
9 | There's no evidence, by the way, that he was selling
10 | any of that.  He just collected these various tendons or bones
11 | or what have you, that were a personal collection, so to
12 | speak.  His thinking has now has gone in that direction and he
13 | has made a mistake in judgment.  And once that step goes, his
14 | next step was when he was, he saw perhaps as a fancy in his
15 | experiences at NASA, that there was a possibility that samples
16 | were not being used that were stored and housed at NASA, that
17 | no one would miss.  Or that, perhaps, he felt obviously
18 | mistakenly that they weren't going to hurt anyone to take
19 | them.  And this is the step, it's a small step as his thinking
20 | went awry, but that's what leads him into this conversation
21 | with Mr. McWhorter, where Mr. McWhorter then supports him.
22 | Mr. McWhorter says, you know, that's not a bad idea.
23 | Maybe we can do this.  Had he not had this conversation with
24 | Mr. McWhorter, you know, it might have just been a fancy, a
25 | dream in his mind.  But Mr. McWhorter, perhaps also seeking

1  some sort of fancy agreement in his mind, agrees with him and
2  that support is enough for Mr. Roberts then to think, well,
3  let's just see if somebody is interested in this kind of
4  material.  And they broadcast these e-mails out and lo and
5  behold, they get someone that expresses some real interest in
6  it.  And they, within a week or a month, a short period of
7  time of when this theft actually occurs, that's the first time
8  that he says anything to, to Tiffany or Shae.

9         So there had been no grand scheme or plan here.
10 It's just something that now it's close, and he's gotten some
11 information that indicates somebody really is interested, and
12 so he says something to those two girls.  People are
13 realistic.  They're not going to be able to offer him much
14 help.  They can't help him move a safe.  They can open a door,
15 they can look out for him, but they are not, they're not the
16 people that you would choose if you were really scheming and
17 cunning how you're going to try to move this equipment around,
18 that kind of safe.

19        He gets this material, and then they're going to
20 drive it to Orlando.  They go in, in Tiffany's car.  He
21 doesn't even have decent transportation to get over there,
22 himself.  They're not armed, they don't have any weaponry.
23 Their negotiations throughout this process had been naive and
24 unsophisticated.

25        His initial e-mails to people were $500 a gram.

1  That's what he was, that's what he had offered this material
2  on the, on his e-mails and he had estimated, he had thought
3  there might be 500 grams in this safe; and therefore, he
4  thought, well, that would equal out to this amount of dollars
5  and that's really the money figure that they had thought
6  about, in terms of his personal culpability.  What he did, he
7  thought this was worth, what did he think he was taking, he
8  was hoping to get $250,000 as, as the total amount of payment
9  from this.
10         So his, his, his thinking had started off as, as a
11  good idea when he was younger that he saw the situations that
12  were being under utilized and he was rewarded for being a
13  self-starter and aggressive and making use of these things.
14  And he saw some circumstances that then led him to something
15  small, and then when he was induced, he saw an opportunity for
16  something that was obviously much more serious and a much
17  greater mistake.  But it wasn't that his thinking was
18  manipulative or he was trying to con people.  We disagree with
19  that.  His thinking was he wasn't hurting somebody.  He wasn't
20  harming someone.  He was just, his thinking was forward
21  thinking.  He was, like, progressive.  We can have great
22  lives.  We can go on and do good things.  It's just, he didn't
23  understand that this wasn't the right way to achieve those
24  things.
25         This is a person, he's self-trained.  He's got a

1  pilot's license, he's got a scuba license, he's got advanced
2  scuba certificates.  He has achieved a lot in his life.  And I
3  would submit that, I can tell the Court's going to impose a
4  substantial and grievous penalty on this person, which I would
5  submit in retrospect, is not going to deter others.  It's not
6  a deterrence of other people in this kind of a scenario.  I
7  don't think it fits with his, his real internal culpability.
8  He's mistaken.  He doesn't, you know, he doesn't understand,
9  didn't understand how the world works enough to realize the
10  evil that this crime involved, but it's not that he was acting
11  out with an evil intent.

12          THE COURT:  Ms. Bedke?

13          MS. BEDKE:  Your Honor, I would only note that the
14  Government has recommended, and I don't know that it's an
15  issue since the two cases have been combined for sentencing
16  purposes, that we recommended a concurrent sentence for the
17  Utah case to the sentence for this case.  And otherwise, Your
18  Honor, I would move to dismiss Count Three at the appropriate
19  time.

20          THE COURT:  For the Record, there's a motion to
21  consolidate pending, so I'll grant that.

22          Mr. Roberts, would you like to say anything?

23          THE DEFENDANT:  Yes, I would.  Sorry, I'm very
24  nervous, but Your Honor, I believe you have a very -- of
25  course, you've been presented all the bad things I've done in

1  my life, but your image of me has been very shaded.  It makes
2  me very uncomfortable to even talk to you.  But from what I've
3  been hearing today, I think it would be important for you to
4  know that the reason I even considered taking these moon rocks
5  out of that cabinet was Everett Gibson had shown them to me a
6  year before.  He had, because of my enthusiasm and he had
7  informed me that they'd been there for a long time and he was
8  basically in charge of just leaving them there and he let me
9  know they weren't being used.  I know he was using the Martian
10 meteorite, but it wasn't, at that time, in the filing cabinet
11 and in fact, later, a year later, the larger piece was taken
12 out of his office.
13        But they were represented to me as objects that had
14 already been used and since they'd been in the curatorial, had
15 been broken off of larger pieces which still had the original
16 information.  And I'm not trying to justify my actions, they
17 were definitely wrong, but I'm just trying to give you some
18 kind of perspective of where I was coming from in there.
19        I'm embarrassed and ashamed of my actions.  I never
20 had to be in a position like this before.  And I've been
21 beating myself up over this for the whole time I've been
22 locked up.  I came into that whole thing, obviously, very
23 naive.  I've never had a chance yet to apologize.
24        I have somebody to apologize to.  I'd like to
25 quickly take that chance first to apologize to NASA for

1  embarrassing them and for any trouble any individual or
2  organization had to go through because of my actions.  And
3  especially for abusing the trust that I had between so many
4  individuals there.  So many people that were my mentors and my
5  heroes are now very disappointed in me because of the
6  potential they saw in me and encouraged in me.  And at a weak
7  moment, I did the wrong thing and abused that trust.
8         And I still believe NASA is a wonderful
9  organization.  It inspires millions of people around the world
10 to achieve higher goals and, you know, to reach for higher
11 things.  I still have a complete respect for them and now I
12 have to think of myself as a person who did this to basically
13 my hero organization.  And at the same time, I took away my
14 own dream of being an astronaut.
15         I want to apologize to the University of Utah, which
16 I'm very fond of.  I've enjoyed all my time there.  And all
17 the professors there, they really reached up, reached down to
18 lift me up and encourage my enthusiasm for being a leader and
19 supported me in leadership roles.  And even though some of
20 them have written me since and let me know they believe in my
21 commitment to some day to make up for this and still make a
22 difference in science, it's hard to even face the fact that
23 I've let all them down.  These are who I considered my role
24 models.  Basically, all my best friends are PhD's and people
25 that I hang out with or people that I go the weekends with

1  are, and now all of them are disgraced by my actions.

2          I want to apologize publicly to Tiffany Fowler.

3  I've learned some of my interactions with so many people in

4  here, how those could be construed and I understand why people

5  think that I was using her and others and stuff.  That's not

6  how it was.  I was naive enough to believe that sure, I knew I

7  was doing something wrong, but I didn't see it as being

8  terribly wrong.  I was more concerned about being able to get

9  over the problem I was having with going through a divorce and

10  start a new life and be able to still be a provider.  I, in no

11  way, am trying to justify, but the damage that's caused to her

12  life and her career, let alone the burden I have to feel about

13  not being able to come through with the promise that I had

14  given her to make her happy.

15          I haven't forgiven myself for any of this really,

16  but I want to apologize also to Shae Saur.  When I first

17  started getting to know Shae, it was about a year prior to

18  this offense.  I had taken a group of co-ops and interns up to

19  a state park.  And we, we hiked up on to a batholith and put

20  our sleeping bags out under the stars.  I talked to her all

21  night and at this point, she was considering dropping out of

22  the intern program and, in fact, dropping out of engineering

23  altogether at her school.  And she had been facing a lot of

24  pressures and competitions.  She's younger than everybody

25  else.  And I encouraged her that she could not only do that,

1  but that she could reach for the goal I was reaching for,
2  being an astronaut.  And we became good friends.  It felt so
3  wonderful to be that kind of support for somebody, to
4  encourage them and their dreams.  Now, I can't even express
5  how I feel as to go from that, to knowing that I'm the person
6  who contributed in taking the same dream back away.
7          I know it's really hard for anyone outside to see
8  who I am inside and it's probably hard to believe that anyone
9  could be as naive as I am.  And my contacts have all been very
10 limited with people before this experience.  I've learned a
11 lot since then.  But my atrocious acts here weren't the
12 intention; intentions don't change how it came out.  But all I
13 can do now is, is hope to get this behind me as soon as
14 possible and continue my education and get a PhD.  And some
15 day -- some day I'll make all the people that are now
16 disappointed in me, all the people that I still hold as heroes
17 and mentors, make them proud of me again and make some kind of
18 significant contribution to science.
19          I think I should also apologize to science.  At the
20 time, I had tried to justify my actions, thinking because I
21 knew these samples were already consumed, as much as they said
22 they were going to, and if they were gonna use any, need
23 anymore information, the original samples were there.  It
24 doesn't justify the disgrace and embarrassment I brought to,
25 to NASA and to science as a whole.  Especially when I'm the

1  person who really regards science as very important.  It's
2  been a very important factor of all my ambitions and
3  discoveries.

4          I'd just like to apologize to everyone who's been
5  adversely affected by my actions.  Thank you.

6          THE COURT:  Court having asked the Defendant why
7  judgment should not now be pronounced, no cause to the
8  contrary appearing to the Court, the Defendant and his
9  attorney having made a statement on his behalf, the Court
10 having reviewed the pre-sentence report, pursuant to the
11 Sentencing Reform Act of 1984, it is the judgment of the Court
12 that the Defendant, Thad Ryan Roberts, is hereby committed to
13 the custody of the Bureau of Prisons for a term of 100 months.
14 This term consists of terms of 60 months as to Count One; 100
15 months as to Count Two of Case Number 02-147, and a term of 46
16 months on Count One of 03-150.  All such terms to run
17 concurrent.

18          Upon release from imprisonment, you shall be placed
19 on supervised release for a term of three years.  This term
20 shall consist of terms of three years on each of Count One and
21 Two in Case Number 02-147; in Count One of 03-150.  All such
22 terms to run concurrent.

23          Mandatory drug testing requirements are suspended
24 based upon you posing a low risk of future substance abuse.
25          While on supervised release, you shall comply with

1   the standard conditions adopted by the Court in the Middle
2   District of Florida.   In addition, you shall participate as
3   directed in a program of mental health treatment approved by
4   the probation office.   Further, you shall be required to
5   contribute to the costs of services for such treatment in an
6   amount determined reasonable by the probation office based
7   upon ability to pay or availability of third-party payment and
8   in accordance with the probation office's sliding scale for
9   mental health treatment services.
10          You shall be prohibited from incurring new credit
11  card charges, opening additional lines of credit, making
12  acquisitions or obligating yourself for any major purchases
13  without approval of the probation officer.   You shall provide
14  the probation officer access to any requested financial
15  information.
16          Based upon your limited financial status, the fine
17  and applicable costs of supervision and imprisonment are
18  waived.
19          In lieu of paying a fine, you shall perform 150
20  hours of community service as a condition of supervised
21  release.
22          It is further ordered that you shall pay to the
23  United States a special assessment of $300, which is due
24  immediately.
25          The mandatory restitution provisions of 18 USC

1  Section 3663 apply in this case.  It is ordered that you shall
2  make restitution in the amount of $9,167.12 to NASA, Chief
3  Financial Officer, NASA Headquarters, Washington, D.C.
4  restitution is payable to the Clerk, U.S. District Court, for
5  distribution to the victim.  While in the custody of the
6  Bureau of Prisons, you shall make payments of either quarterly
7  installments of a minimum of $25 if working non-UNICOR, or a
8  minimum of 50 percent of monthly earnings if working in a
9  UNICOR position.
10         Upon release from custody, your financial
11  circumstances will be evaluated and the Court may establish a
12  new payment schedule.  At any time during the course of
13  supervision, the Court may be notified by you, the victim or
14  the Government, that there's been a material change in your
15  ability to pay and the payment schedule may be adjusted.
16  Restitution shall be paid jointly and severally with Gordon
17  McWhorter, Tiffany Fowler and Shae Saur.
18         Are there any forfeiture assets as to Mr. Roberts?
19         MS. BEDKE:  No, Your Honor.
20         THE COURT:  The Court finds that you have provided
21  substantial assistance to the Government pursuant to 5(k)1.1.
22  The Court did depart one level based on that, although the
23  Court did also do an upward departure.
24         In accordance with the plea agreement, it is ordered
25  that Count Three of the indictment in Case Number 02-147 be

1  dismissed.

2         You're hereby remanded to the custody of the United

3  States Marshal to await designation by the Bureau of Prisons.

4         The Court having pronounced sentence, does counsel

5  for the Defendant have any objections to the sentence or to

6  the manner in which the Court has pronounced sentence?

7         MR. FERNANDEZ:  Your Honor, we just reiterate our

8  objections to the upward departure.

9         THE COURT:  All right.

10        MR. FERNANDEZ:  As well as the, the lack of a

11  downward departure being granted.

12        THE COURT:  All right.  Any objections by the

13  Government?

14        MS. BEDKE:  No, Your Honor.

15        THE COURT:  To be extent permitted by your plea

16  agreement, Mr. Roberts, you're now advised that it is your

17  right to appeal from this sentence within ten days of today's

18  date or from the date the judgment is recorded, whichever is

19  later.  Failure to appeal within the ten-day period is a

20  waiver of your right to appeal.

21        The Government may file an appeal from this

22  sentence.  You're also advised that you are entitled to the

23  assistance of counsel in taking an appeal.

24        You are court appointed, aren't you?

25        MR. FERNANDEZ:  Yes, Your Honor.

1          THE COURT:  So Mr. Fernandez will continue to

2    represent you in regard to any appeal unless he's given

3    permission to withdraw.

4          Is there anything further?

5          MS. BEDKE:  No, Your Honor.

6          MR. FERNANDEZ:  Your Honor, we would ask for

7    recommendation for placement in a camp, in Nellis, Nevada.

8          THE COURT:  All right.  I'll make that

9    recommendation to the Bureau of Prisons.

10          (Proceedings concluded at 10:15 a.m.)

11                    C E R T I F I C A T E

12    I HEREBY CERTIFY THAT THE FOREGOING IS AN ACCURATE

13    TRANSCRIPTION OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15    12-4-03
      DATE                    OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25